United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DON MOODY,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF SANTA CLARA, et al.,<br><br>    Defendants. | Case No. 5:15-cv-04378-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 47 |

In a First Amended Complaint ("FAC"), Plaintiff Don Moody ("Moody") has re-pled a previously dismissed §1983 action against the County of Santa Clara, the Director of the Social Services Agency ("SSA"), and Bruce Wagstaff (collectively, "Defendants"), again alleging violations of civil rights in connection with his termination from the position as the Public Guardian. As before, Defendants move to dismiss the cause of action under Federal Rule of Civil Procedure 12(b)(6). Mot. to Dismiss ("Mot."), Dkt. No. 47.

The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and the Court finds this matter suitable for decision without oral argument. Civ. L.R. 7-1(b). After reviewing the amended allegations, the Court has determined the FAC states a plausible § 1983 claim against Defendants for one of Moody's two claims. Thus, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART for the reasons explained below.

I. **FACTUAL AND PROCEDURAL BACKGROUND**

The basic factual allegations remain largely unchanged from the prior version of the

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
1

complaint.[1] Moody served as Public Guardian for Santa Clara County for six years, beginning in September 2008. FAC ¶ 22. On September 25, 2014, he was put on administrative leave and subsequently terminated. *Id*. ¶ 31.

Before Moody took over as Public Guardian, the Office of the Public Guardian ("the OPG" or "the Office") had been subjected to significant criticism in the media. *Id*. ¶¶ 20, 22. This continued during Moody's tenure. *Id*. ¶¶ 23-28. Relevant examples include reports that the OPG was facing scrutiny for elder abuse and neglect published by Examiner.com in May 2012, reports that the Office was "unnecessarily taking control of elderly people's lives and denying them visitors," published by ABC 7 News in three November 2012 articles, and a report that the Office had "continu[ed] to spend [a] woman's money even after her conservatorship formally ended," published by ABC 7 News in a January 2014. *Id.* ¶¶ 23-25, 27. In addition, in 2013 and 2014, the Santa Clara County Civil Grand Jury issued two reports identifying issues of concern within the OPG and how the OPG had failed to address them. *Id.* ¶¶ 26, 28. None of the articles identified Moody by name or suggested that he had been personally responsible for the problems at the OPG. *Id*. ¶ 29. Nevertheless, Moody alleges that his name and contact information were readily available online to any member of the public who read the articles and wanted to look up who was in charge of the Office. *Id*.

After the 2014 Report issued, County employee Barbara Herlihy sent an unsolicited letter to the Civil Grand Jury that "blamed [Moody] for all of the problems in the office and expressed [her] opinion that he should not keep his job" (the "Herlihy Letter"). *Id*. ¶¶ 30-31. Moody alleges that the Herlihy Letter was "leaked by the County" to the *San Jose Inside*, where it was published online and remains publicly available.[2] *Id*. ¶ 30.

On September 25, 2014, Moody was placed on administrative leave with the

---

[1] For a more detailed discussion of Moody's factual allegations, see this Court's order granting Defendants' motion to dismiss Moody's original complaint (Dkt. No. 41 at 1-4).
[2] As alleged in the FAC, a PDF copy of the Herlihy Letter is available online at http://www.sanjoseinside.com/wp-content/uploads/2014/09/Probate-Conservator-Audit.pdf. *See id.* ¶ 30.

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
2

recommendation that he be terminated as the Public Guardian. *Id.* ¶ 31. On that date, Wagstaff gave Moody a letter stating that he would be placed on administrative leave until further notice and that Wagstaff was recommending that he be terminated (the "Termination Letter"). *Id.* The Termination Letter provided that the reason for the recommendation was Moody's alleged violation of County Merit System Rules, Article 11, which states:

> Section A25-301(a)(2) Inefficiency, incompetence, or negligence in the performance of duties, including failure to perform assigned task or failure to discharge duties in a prompt, competent and responsible manner.

*Id.*; *see also* Dkt. No. 10-2 (redacted copy of Moody's Termination Letter). The Termination Letter also informed Moody that he had a right to respond to the recommendation and outlined the available procedures. Dkt. No. 10-2 at 6-7. First, Moody was entitled to a Skelly hearing, scheduled for October 8, 2014, before Deputy County Executive René Santiago. *Id.* at 6. The Termination Letter advised that this hearing "is not a formal hearing with the examination of witnesses, nor is there a right to a court reporter or transcript of any proceedings." *Id.* Second, if Moody was not satisfied with the final action of his Skelly Officer, he could appeal the decision and have a public hearing before the Santa Clara County Personnel Board ("Personnel Board"). *Id.* The Personnel Board's findings, conclusion, and decision would be advisory to the County Executive, who would then review them and make a final decision. *Id.* at 7.

Following the meeting with Wagstaff, Moody alleges that he was "immediately [required] to turn over his badge and work phone, and was escorted out of the building in full view of the public" and his then co-workers. FAC ¶ 34. According to Moody, this was done "at the direction of Mr. Wagstaff." *Id.* ¶ 35. Moody alleges that, during his six year tenure as Public Guardian, he "had never witnessed anyone in his office terminated in a similar fashion, nor had he heard of any County official being terminated in such a manner." *Id.* Moody also alleges that his predecessor, Rob Cecil, who had also been terminated from the position of Public Guardian, "was not escorted from the workplace in a similar manner." *Id.*

On the same day as Moody's termination, the *San Jose Inside* published an article entitled, "County Public Guardian Put on Leave, Escorted Out of Building." *Id.* ¶ 34. Moody alleges that

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
3

Defendants "intentionally leaked to the press information about Mr. Moody's termination, including the fact that he had been physically escorted from the premises." *Id.* ¶ 35. Moody also alleges that he "believes, but not has been able to confirm, that Mr. Wagstaff authorized or permitted the press leak as to Mr. Moody's termination." *Id.* ¶ 38. According to Moody, this article is still available online and can be found on Internet searches using Moody's name. *Id.* ¶ 36.

Moody alleges that he was unable to find full time work for approximately one year after his termination, and that, during job interviews, this "walkout" was raised as a concern. *Id.* ¶ 40. Moody also contends that, although he is now employed, he has been "unable to secure work in his chosen profession." *Id.*

Moody initiated the instant action on September 24, 2015. Dkt. No. 1. Defendants moved to dismiss Moody's complaint, which the Court granted with leave to amend. Dkt. No. 41. Moody filed an FAC and this motion followed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the… claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although particular detail is not generally necessary, the factual allegations "must be enough to raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Id.* at 556-57. A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Dismissal of a claim under Rule 12(b)(6) may be based on a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988); *see Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

At the motion to dismiss stage, the court must read and construe the complaint in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*,

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
4

556 U.S. 662, 664 (2009). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "In all cases, evaluating a complaint's plausibility is a context-specific endeavor that requires courts to draw on ... judicial experience and common sense." *Levitt v. Yelp! Inc*., 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

When deciding whether to grant a motion to dismiss, the court generally "may not consider any material beyond the pleadings." *Hal Roach Studios, Inc. v. Richard Feiner & Co*., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, the court may consider material submitted as part of the complaint or relied upon in the complaint, and may also consider material subject to judicial notice. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). In the event that a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc*., 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv–Well Furniture Co*., 806 F.2d 1393, 1401 (9th Cir. 1986)).

### III. DISCUSSION

#### A. Procedural Due Process Claim

The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Courts analyze procedural due process claims in two steps. First, the court "asks whether there exists a liberty or property interest which has been interfered with by the State." *Vasquez v. Rackauckas*, 734 F.3d 1025, 1042 (9th Cir. 2013) (internal quotation marks and citation omitted). If the court finds a protected interest, it proceeds to step two to determine what process is due. *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985). The Court analyzes Moody's claim under this framework.

##### i. Step One: Deprivation of Liberty or Property Interest

As a general rule, "injury to reputation, standing alone, is not a liberty or property interest sufficient to invoke the procedural protections contained in the Due Process Clause of the Fourteenth Amendment." *Eberhard v. California Highway Patrol*, 73 F. Supp. 3d 1122, 1130

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
5

(N.D. Cal. 2014); *see also Ulrich v. City & Cty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002). However, where a plaintiff has suffered such egregious reputational damage so as to impact other rights, courts have recognized a limited property or liberty interest protected by the Due Process Clause. *See Eberhard*, 73 F. Supp. 3d at 1130. A claim for deprivation of this interest without due process has become known as a "stigma plus" claim. *Id*.

To bring a stigma plus claim, a plaintiff must allege that a "state action not only caused the stigma of a damaged reputation, but also that the state action deprived the plaintiff of a protected liberty or property interest or a status recognized by the state." *Id*. (citing *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999) (en banc)). In the Ninth Circuit, a plaintiff can satisfy the "stigma plus" test under either of two theories: First, a plaintiff may assert that the injury to their reputation "caused the denial of a federally protected right," for example, where accusations made in the press by a prosecutor result in the denial of an impartial jury under the Sixth Amendment. *Id*. Or second, a plaintiff may allege that the injury to their reputation was "inflicted in connection with a federally protected right," such as "defamation in the course of termination of public employment by the state." *Id*. (citing *Cooper v. Dupnik*, 924 F.2d 1520, 1532 (9th Cir. 1991)). Here, Moody's claim arises under the second theory, alleging that significant damage to his reputation was inflicted in connection with the termination of his employment from the OPG.

Under the second theory, "[a] defendant's remarks in connection with discharge from employment must contain egregious accusations such as 'charges of immorality, or dishonesty that can cripple an individual's ability to earn a living.'" *Turner v. City & Cty. of San Francisco*, No. C-11-1427 EMC, 2012 WL 6631490, at *6 (N.D. Cal. Dec. 19, 2012), *aff'd sub nom. Turner v. City & Cty. of San Francisco*, 788 F.3d 1206 (9th Cir. 2015), and *aff'd sub nom. Turner v. City & Cty. of San Francisco*, 617 F. App'x 674 (9th Cir. 2015) (quoting *Hyland v. Wonder*, 972 F.2d 1129, 1142 (9th Cir. 1992)). To rise to the level of egregiousness required for a stigma plus claim, a defendant's remarks generally must go beyond mere accusations of incompetence. *See Gray v. Union Cnty. Intermediate Educ. Dist.*, 520 F.2d 803, 806 (9th Cir. 1975) (finding that the defendant's accusations of "insubordination, incompetence, hostility toward authority, and

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
6

aggressive behavior" – while unflattering – did not "import serious character defects such as dishonesty or immorality," and thus were not sufficient to state a due process claim); *Wheaton v. Webb-Petett*, 931 F.2d 613, 617 (9th Cir. 1991) (holding that "charges of incompetence or inability to get along with others do not" implicate a liberty interest); *Turner*, 2012 WL 6631490, at *6 (concluding that allegations of illegal hiring practices were "not sufficiently damning to create a stigma-plus claim."); *see also Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 366 (9th Cir. 1976) (explaining that the need for constitutional Due Process protections is not particularly strong for general disputes over an employee's workplace performance). Additionally, to be actionable, an allegedly stigmatizing statement must be "substantially false" and "must occur in conjunction with the termination of employment." *Turner*, 2012 WL 6631490, at *6 (citing *Campanelli v. Bockrath*, 100 F.3d 1476, 1482 (9th Cir. 1996) and *Siegert v. Gilley*, 500 U.S. 226, 234 (1991)); *see also Hyland*, 972 F.2d at 1142 ("The federal Constitution is not concerned with every insult hurled in the heat of an employment dispute.").

Here, as before, there is no question that Moody has alleged a "deprivation of a protected liberty or property interest or a status recognized by the state"—or a "plus": he was terminated from public employment. *See Eberhard*, 73 F. Supp. 3d at 1130. Instead, the parties dispute whether Moody has sufficiently plead a reputational damage—or "stigma"—that is attributable to the Defendants' conduct. The FAC alleges two stigmatizing "statements" that potentially satisfy this element: (1) escorting Moody out of the building; and (2) leaking information about Moody to the press. Construed liberally, the Court finds both sufficient.

a. Information Allegedly "Leaked" to the Press Regarding Moody

Taking these in reverse order, Moody contends that he suffered reputational harm when Defendants purportedly "leaked" negative information about him to the media. FAC ¶ 30 (alleging that "A copy of [the Herlihy Letter] was leaked by the County to *San Jose Inside* and posted online."); ¶ 37 ("On information and belief, defendants intentionally leaked to the press information about Mr. Moody's termination, including the fact that he had been physically escorted."); ¶ 49 ("On information and belief, including the aforementioned leak to the *San Jose*

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
7

*Inside* and media reports of Mr. Moody's walkout, defendants disclosed Mr. Moody's name to local media outlets accusing him of incompetence and elder neglect or abuse."); ¶ 53 ("On information and belief, the County disseminated accusations to the press in an attempt to make Mr. Moody a scapegoat in order to deflect criticism away from those who were actually responsible for the conduct criticized by the press"); and ¶ 55 ("On information and belief, the County publicized stigmatizing information about Mr. Moody in connection with his termination.").

As the Court observed in its first dismissal order, an allegation that Defendants intentionally leaked false and damaging information about Moody to the press could constitute a "state action caus[ing] the stigma of a damaged reputation." *See Eberhard*, 73 F. Supp. 3d at 1130; *WMX Techs*., 197 F.3d at 376. To qualify, the allegation would have to meet the requirements discussed above, including that (1) the statement was made by a state actor, (2) the statement was sufficiently egregious; (3) the statement was "substantially false," and (4) the statement "occurr[ed] in conjunction with the termination of employment." The parties do not dispute that, as alleged, Defendants' purported "leak" satisfies the final two requirements. Thus, the only remaining questions are whether the "leak" satisfies the first two. The Court finds that it does.

As to the first requirement, the FAC's allegations are adequate to attribute the "leak" to the County, a state actor. Under *Monell v. Dep't of Soc. Servs. of City of New York*, the County can only be held liable for the "leak" if it was "execution of a government's policy or custom" or was ratified by someone with "final policymaking authority." 436 U.S. 658, 694, 661 98 S. Ct. 2018, 2037-38, 56 L. Ed. 2d 611 (1978). In the FAC, Moody alleges that he "believes, but has not been able to confirm, that Mr. Wagstaff authorized or permitted the press leak as to Mr. Moody's termination." FAC ¶ 38. The FAC also alleges that Wagstaff was the Director of the SSA, and that, as such, he "has the power 'to appoint, suspend or remove all assistants, department directors, deputies, clerks and other employees necessary to conduct the work of the [Social Services] Agency'" *Id*. ¶ 19. Construed in the light most favorable to Moody, these allegations are

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
8

sufficient to allege a basis for County liability. This is particularly true given that only Wagstaff can confirm whether he authorized the alleged leaks. Thus, an alleged belief by Moody, a managerial employee with likely at least some working knowledge of how information concerning OPG could be conveyed to the press, is sufficient to satisfy this element at the pleading stage.

As to the second requirement, at least when viewed in the light most favorable to Moody, the alleged "leak" is sufficiently egregious to qualify as a stigmatizing statement. As discussed above, a stigmatizing statement "must contain egregious accusations such as 'charges of immorality, or dishonesty that can cripple an individual's ability to earn a living.'" *Turner*, 2012 WL 6631490, at *6 (quoting *Hyland*, 972 F.2d at 1142). Accusations of incompetence are not sufficient. *See Gray*, 520 F.2d at 806. Here, the FAC identifies a number of damaging accusations that were levied against the OPG which could not only suggest incompetence, but also raise the specter of dishonesty. *See, e.g.*, FAC ¶ 23 (article revealing that a conservatee had been "subjected to neglect in the form of isolation from nearly all visitation and telephone calls for over two (2) years"); ¶ 25 (article criticizing OPG's decision to take out a reverse mortgage on a conservatee's home, notwithstanding the conservatee had dementia and had been removed from her home); ¶ 27 (article accusing the OPG of continuing to spend a woman's money even after her conservatorship formally ended). Given the closeness in time between these accusations and Moody's termination, it is at least plausible that "leaking" the fact that Moody was terminated could also communicate that Moody was responsible for these shortcomings. It is also plausible that people would make this connection, because, as Moody alleges, his name and association with the OPG was readily accessible online. FAC ¶ 29. Once this connection was made, it is plausible that people could impute the allegedly questionable nature of the OPG's actions to Moody, which could amount to a "charge[] of immorality[] or dishonesty." *Hyland*, 972 F.2d at 1142.

Strengthening the plausibility of this theory is the "leak" not only communicated that Moody was terminated, but also that he was terminated in an unusual way. The FAC alleges that in his six year tenure as Public Guardian, Moody "had never witnessed anyone in his office terminated [by being escorted out of the office], nor had he heard of any County official being

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
9

terminated in such a manner." FAC ¶ 38. It also alleges that Moody's predecessor—who was also terminated—did not receive the same treatment. *Id*. ¶ 39. Taken as true, these facts suggest that there was something particularly concerning about Moody as an ex-employee. This further increases the plausibility that the "leak" rose to the level of a "charge[] of immorality or dishonesty." *Hyland*, 972 F.2d at 1142.

Finally, in addition to the suggestion of "immorality[] or dishonesty," Moody has also alleged that the "leak" has "cripple[d] [his] ability to earn a living." *Hyland*, 972 F.2d at 1142. The FAC states that in job interviews, the "walkout from the Public Guardian's office was raised as a problem to hiring Mr. Moody." FAC ¶ 40. It also alleges that, although currently employed, Moody "has been unable to secure work in his chosen profession." *Id*. Taken as true, these allegations further strengthen the plausibility that the "leak" falls within the category of egregious statements sufficient to constitute a "stigma" in a stigma plus claim. Accordingly, Moody has adequately alleged this claim element.

> b. The Act of Escorting Moody from the Office Building at the Time of His Suspension

Moody also argues that the act of being escorted out of the building was a stigmatizing statement. FAC ¶ 34 ("Mr. Moody . . . was escorted out of the building in full view of the public, including Mr. Moody's then-co-workers"); ¶ 35 ("Mr. Moody was walked out of the building at the direction of Mr. Wagstaff").

It is undisputed that the escort was performed by a state actor (the County), that the information communicated was "substantially false," or that it "occur[ed] in conjunction with the termination of employment." Thus, the only question is whether the act was a sufficiently egregious stigmatizing statement. *Turner*, 2012 WL 6631490, at *6 (quoting *Hyland*, 972 F.2d at 1142) (a stigmatizing statement "must contain egregious accusations such as 'charges of immorality, or dishonesty that can cripple an individual's ability to earn a living.'").

The act of escorting Moody out of the building communicates two of the same things that the alleged "leak" also communicated: (1) Moody was terminated; and (2) Moody was escorted

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
10

from the building. As discussed above, the conveyance of this information—when viewed in light of the alleged negative press about the OPG and Moody's allegations about his future employment prospects—qualifies as a sufficiently stigmatizing statement. Thus, for the same reasons as discussed above, the "act" of escorting Moody out of the building also suffices as a "stigma" that can form the basis for his stigma-plus claim.

    c. Conclusion

Accordingly, because Moody has plausibly alleged both "stigma"—reputational damage caused by either the act of escorting him out of the building or the "leak" of negative information about him—and a "plus"—deprivation of public employment—he has alleged deprivation of a liberty or property interest sufficient to trigger due process protections. Thus, the Court proceeds to evaluate the sufficiency of his claim under the second step of the due process analysis.

  **ii. Step Two: Adequacy of Process**

At step two, the Court determines what process is due. *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985). It "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Vasquez*, 734 F.3d at 1042. To guide the second step of the analysis, courts consider the three-part balancing test announced in *Mathews v. Eldridge*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 334-35 (1976). Due process requires the right to be heard "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970).

In the context of a stigma-plus claim, if a liberty interest is implicated, the stigmatized employee is entitled to a "name-clearing" hearing or similar process to refute the stigmatizing charge. *Cox*, 359 F.3d at 1110; *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998). Due process imposes no hard and fast requirements on this "name-clearing" hearing, including, for example, whether it must be public, evidentiary in nature, or held prior to

deprivation of the liberty or property interest. *Cf. Shinault v. Hawks*, 782 F.3d 1053, 1057 (9th Cir. 2015) ("Due process 'is a flexible concept that varies with the particular situation.'"). Instead, courts must evaluate the adequacy of the process according to *Mathews*.

The Ninth Circuit's decision in *Mustafa v. Clark Cty. Sch. Dist.*, 157 F.3d 1169, 1173 (9th Cir. 1998) is instructive. There, a high school teacher was accused of sexual misconduct and recommended for dismissal. *Id*. at 1172. After the accusation was reported, he was notified of the charges in a January 19th meeting with the school's principle and school district's legal counsel, where he was handed a "Notice of Intended Disciplinary Action: Immediate Suspension and Dismissal." *Id*. Five days later, on January 24th, he participated in a pre-termination hearing where he gave his version on the events. *Id*. at 1172-73. Roughly two months after that, he participated in a binding arbitration, where an arbitrator evaluated the charges against him. *Id*. at 1173. In evaluating his "stigma-plus" due process claim, the Ninth Circuit determined that he was afforded adequate process "by virtue of his arbitration hearing if not the January 19th and 24th hearings, was afforded the opportunity to clear his name." *Id*. at 1179.

In light of these standards, the Court finds that Moody has not plausibly alleged that he received insufficient process. Although Moody's allegations regarding process are scant, they at least reveal that: (1) prior to the "walkout" and "leak," he was provided with the Termination Letter, which notified him that he was being recommended for dismissal and gave him the basis for that recommendation, FAC ¶ 32; (2) after the "walkout" or "leak," he was given the opportunity to respond to the charges against him in a Skelly hearing, Dkt. No. 10-2 at 6; and (3) after that, he was given the opportunity to appeal the Skelly Officer's final decision in a public, evidentiary hearing before the Personnel Board, *id*. at 6-7.

Even construing this information in the light most favorable to Moody, the Court cannot conclude this process was inadequate. The *Mathews* test makes this clear: Here, the "private interest" is Moody's reputation and its impact on his future employment prospects. The "government's interest" is "the interest of an executive officer to make . . . important personnel decisions," *Patterson v. City of Utica*, 370 F.3d 322, 336 (2d Cir. 2004), and execute them

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
12

effectively. The "risk of an erroneous deprivation of [Moody's] interest through the procedures used" is the risk that the "false charges against [Moody] will go unrefuted and that his name will remain stigmatized." *Id*.

Putting all this together, it is hard to conclude based on the current allegations that the County's process was inadequate. First, the risk of erroneous deprivation seems low—not only was Moody given notice and the opportunity to refute the charges against him in front of Wagstaff during the September 25 meeting, but he also had two additional opportunities—the Skelly hearing and his appeal to the Personnel Board. It seems unlikely that additional value could be gained by additional or substitute process. Second, even if more process could have reduced the risk of erroneous deprivation, the County's interest in making important personnel decisions—especially with respect to a position like Public Guardian—seems to outweigh the small benefit of additional process.

Moody's arguments to the contrary are unpersuasive. Moody argues that the Skelly hearing was inadequate because it was neither public nor evidentiary in nature. Opp. at 8. However, as discussed above, due process is a "flexible concept," and simply because the Skelly hearing was private and informal does not mean it was inadequate. Moreover, to the extent that adequate process does require a public, evidentiary hearing in this case, Moody's right to appeal to the Personnel Board afforded him precisely this opportunity. Moody does not seem to contest this, but instead argues that the appeal to the Personnel Board was inadequate because it would occur 18 months after the "walk-out" and, as because of this large gap in time, it would not be sufficient to clear all of the damage done by the County's stigmatizing statements. *Id*. While an unreasonably long delay in a plaintiff's opportunity to refute stigmatizing statements made against him could potentially make a process inadequate, Moody has not alleged any facts that would establish that such was the case here. There is no indication that the Termination Letter and Moody's Skelly hearing were not sufficient opportunities for Moody to clear his name or that, if they were, 18 months was so unreasonably long so as to effectively deny Moody the opportunity to clear his name.

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
13

In sum, Moody's complaint fails to plausibly allege that he was denied inadequate process. For this reason, Defendants' motion to dismiss Moody's procedural due process claim is GRANTED. However, because Moody's allegations regarding process are sparse and because the Court has not yet dismissed his claim on these grounds, he will be granted leave to amend.

### B. Substantive Due Process Claim

The second cause of action for violations of substantive Due Process asserts that Defendants' deprived Moody of his property interest in continued employment with the County, as well as his liberty interest in the right to work in his chosen field. FAC ¶¶ 61-65.

The doctrine of substantive due process prevents the government from engaging in conduct that "'shocks the conscience' and is 'arbitrary in the constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted). Where conduct of a government employer is found to meet this standard, and a person's ability to pursue a particular procession was foreclosed as a result, the person may bring a substantive Due Process claim. *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 997-98 (9th Cir. 2007); *aff'd sub nom. Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008). However, in recognizing the right to bring such a claim, the Ninth Circuit made clear that a substantive due process action for a public employer's violations of occupational liberty is limited to extreme cases, explaining:

> We decline to hold that there is no substantive due process claim for a public employer's violations of occupational liberty. Rather, we limit the claim to extreme cases, such as a "government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure."

*Id.* (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)).

Taken as true and construed in the light most favorable to Moody, the allegations in the FAC meet this standard. As discussed above, the County's alleged "walkout" and then subsequent "leak" of negative information about Moody, when viewed in the context of the negative press that had been circulating about the OPG and the fact that Moody could be easily identified as the head of the OPG, are sufficiently egregious such that they could "effectively preclude future work in

[Moody's] chosen profession." *Merritt v. Mackey*, 827 F.2d 1368, 1373 (9th Cir. 1987). Indeed, the FAC alleges precisely this: "As a direct and proximate result of the actions and omissions of defendant described above, defendants have prevented Mr. Moody from continuing to work in his chosen profession. Defendants have effectively barred Mr. Moody, permanently, from pursuing his chosen profession." FAC ¶ 65. Accordingly, Moody has adequately plead that the County's actions rise to the level of violating his substantive due process rights.

Moody's substantive due process claim also is not barred—as Defendants argue, Mot. 14-16—by the rule in *Graham v. Connor*, which states that where another provision of the Constitution "provides an explicit textual source of constitutional protection," a court must assess a plaintiff's claims under that explicit provision and "not the more generalized notion of substantive due process." 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Here, Moody is not asserting a constitutional violation grounded in the "specific guarantees of the first Eight Amendments." *Armendariz v. Penman*, 75 F.3d 1311, 1319 (9th Cir. 1996). Rather, both causes of action are due process claims arising out of the 14th Amendment. As such, *Graham* does not bar Moody's substantive due process claim.

Accordingly, because Moody has plausibly alleged a violation of his substantive due process rights and this claim is not barred under *Graham*, Defendants' motion to dismiss Moody's second cause of action is DENIED.

## IV. ORDER

Based on the foregoing, Defendants' Motion to Dismiss (Dkt. No. 47) is GRANTED IN PART and DENIED IN PART. Moody's procedural due process claim is DISMISSED WITH LEAVE TO AMEND. Moody's substantive due process claim will be permitted to go forward.

Any amended complaint must be filed on or before February 26, 2018, and must be consistent with the discussion above. Moody is advised the procedural due process claim will be dismissed with prejudice for failure to prosecute under Federal Rule of Civil Procedure 41(b) if an amended complaint is not filed by the deadline. If that occurs, this action will proceed on the remaining claim asserted in the FAC, with that document as the operative pleading.

Case No.: 5:15-cv-04378-EJD
ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS
15

**IT IS SO ORDERED.**

Dated: January 30, 2018

_____
EDWARD J. DAVILA
United States District Judge